## PEOPLE v. DORRIKAS.

1. ARSON—FIRE—INFERENCES—ACCIDENT—PROXIMATE CAUSE.

The mere fact that a fire has occurred affords no proper basis for an inference that it was wrongfully set, as, under such circumstances, it may be assumed that it was the result of accident or some natural cause.

2. SAME—EVIDENCE—MOTIVE—INSURANCE—INCOME.

Evidence presented in prosecution for arson, which tended to eliminate the possibility of defective wiring and also spontaneous combustion and that the fire damaging defendant's restaurant did not result from any natural or providential causes, together with fact that he had recently trebled insurance coverage while income was declining, held, sufficient to submit cause to jury and to support its verdict of guilty.

3. WITNESSES—QUALIFICATIONS—VALUE OF BUSINESS.

Testimony of witness as to value of restaurant business held, properly excluded in prosecution for arson, where no proper foundation had been laid in that no showing was made that the witness was qualified to testify as to the value of the business.

4. COURTS—SUPREME COURT—SUPERVISORY CONTROL OVER LITIGATION—SAVING QUESTION FOR REVIEW—OBJECTION.

The Supreme Court, in the exercise of supervisory control over all litigation, has the right to consider manifest and serious errors although objection was not made by the party who·

REFERENCES FOR POINTS IN HEADNOTES
[1] 22 Am Jur, Fires §§ 43, 75.
[2] 4 Am Jur, Arson § 67.
[3] 58 Am Jur, Witnesses § 642.
[4] 14 Am Jur, Courts §§ 264, 268, 271.
[5-7, 9] 20 Am Jur, Evidence § 326; 58 Am Jur, Witnesses §§ 657–661. Cross-examination of character witness for accused with reference to particular acts or crimes. 47 ALR2d 1258.
[8] 14 Am Jur, Criminal Law § 129.

appeals, since the inherent power of the Supreme Court is not limited by what the appellant is entitled to as a matter of right.

5. CRIMINAL LAW—CROSS-EXAMINATION OF CHARACTER WITNESS.

Generally, a witness testifying to the good reputation or character of a defendant in a criminal prosecution may be interrogated on cross-examination with respect to rumors or reports of particular acts imputed to · defendant and as to what the witness has heard of specific charges of misconduct made against the defendant, not to establish such acts but to test the credibility of the character witness, by ascertaining his good faith, information and accuracy; such cross-examination being limited as to time and, in some instances, place.

6. EVIDENCE—REPUTATION—CHARACTER—HEARSAY.

Testimony as to the reputation for citizenship, or for honesty and integrity is based on hearsay.

7. CRIMINAL LAW—CROSS-EXAMINATION OF CHARACTER WITNESS—DISCRETION OF COURT—INSTRUCTIONS.

The wide discretion lodged in a trial court with reference to limiting cross-examination of character witnesses in regard to hearsay testimony in a prosecution for crime is accompanied by the responsibility of the trial court to determine, in the absence of the jury, whether or not criminal acts, referred to by the prosecutor as having been committed by the defendant, actually took place, the time of their commission and relevancy to issue being tried and to instruct the jury carefully as to the reason for admission of testimony of such criminal acts.

8. SAME—FAIR TRIAL—COURTS.

An appellate court has the responsibility to ascertain if a defendant in a prosecution for crime has had a fair and impartial trial, a trial free from prejudicial errors.

9. SAME—CROSS-EXAMINATION OF CHARACTER WITNESS—OBJECTIONS—FAIR TRIAL—INSTRUCTIONS.

Defendant, on trial for arson and who did not take the witness stand, held, to have been denied a fair trial, where during cross-examination of his character witness 6 questions were asked as to whether witness had heard of arrests and convictions of defendant in other States for crimes of disorderly conduct, robbery, vagrancy, violation of liquor laws, bank robbery and rape and, notwithstanding no objection was made by defendant's counsel the trial judge did not ascertain out of

presence of jury whether such acts were actually committed and as to the time and place of the acts and failed to instruct the jury as to purpose of such testimony and limitations upon the use they might make of it.

DETHMERS, C. J., and CARR and KELLY, JJ., dissenting.

Appeal from Washtenaw; Breakey, Jr. (James R.), J. Submitted June 12, 1958. (Docket No. 51, Calendar No. 47,295.) Decided October 13, 1958.

James Dorrikas was convicted of arson. Reversed and new trial granted.

*Paul L. Adams,* Attorney General, *Samuel J. Torina,* Solicitor General, *Edmond F. DeVine,* Prosecuting Attorney, *Eugene B. Calder,* Assistant Prosecuting Attorney, for the people.

*Conlin, Conlin & Parker,* for defendant.

CARR, J. (*dissenting*). The defendant in this case was engaged, on May 10, 1953, and for some time prior thereto, in the operation of a restaurant located at 29 North Huron street in the city of Ypsilanti. The building was not owned by defendant but was leased or rented by him. Between 10 and 11 o'clock in the late evening of the date mentioned fire was discovered in the place of business. When the fire department arrived the blaze was apparently confined to the basement, but shortly thereafter the first floor of the restaurant collapsed in part. The damage from actual burning was limited to the basement, and to the first floor of the restaurant.

In connection with the removal of debris from the premises an investigation was conducted by 2 members of the Michigan State police who had training and experience in the investigation of fires suspected as incendiary. Defendant was prosecuted on

a charge of arson, the case being tried before a jury. During the progress of the trial a motion for a directed verdict was made on behalf of defendant on the ground that the proofs introduced by the people were insufficient to permit submission of the case to the jury. The motion was denied. Following the completion of the proofs, the arguments of counsel, and the charge of the court, the jury returned a verdict of guilty, and sentence was imposed. A motion for a new trial was submitted and denied. Defendant has appealed.

On behalf of appellant it is contended that the evidence in the case was insufficient to establish the *corpus delicti*, and, also, that the prosecution failed to establish with the requisite degree of certainty that defendant was guilty of the offense of arson, if such offense had been committed. These claims require a consideration of the testimony on which the cause was submitted to the jury. The police officers who made the investigation testified that they found in the basement, which apparently was used in connection with the restaurant, a mattress filled with kapok, which had been folded over from one end. In the fold was discovered a small amount of excelsior and corrugated paper. It was the claim of the people, in substance, that the fire had been started with the paper and excelsior and had spread to the mattress. The proofs established that the contents of said mattress would burn slowly, giving off an intense heat in so doing. The witnesses claimed further that the floor of the restaurant at the time of the examination indicated that the place of greatest damage from fire was immediately above the mattress.

Defendant was questioned concerning the mattress, stating, according to the testimony, that it belonged to him and that he had kept it for some time in a closet in the basement. The police officers re-

ferred to further stated that the electric wiring in the basement was examined by them for the purpose of discovering whether a short circuit, possibly responsible for the fire, had occurred therein. They found no indication of such situation. Testimony was also offered indicating that the contents of the mattress were of a character that precluded the possibility of spontaneous combustion.

It was shown by the prosecution that prior to a date preceding the fire by some weeks defendant had carried fire insurance in the sum of $10,000, that the carrier of such insurance declined to renew the policy, and that defendant procured insurance elsewhere in the total sum of $22,000, together with a policy for $6,500 against loss sustained by business interruption, and a further policy for $1,500 covering property of defendant located on the third floor of the building. It was also shown by uncontradicted testimony that shortly before the fire occurred defendant procured for the occupant of an apartment on the second floor of the building a policy of insurance covering her property. Defendant suggested such action, and delivered the policy to the insured named therein. Further evidence was offered indicating that defendant's income from the restaurant had been declining for some time prior to the fire. On the basis of the testimony introduced it was the claim of the prosecution that a motive was established on the part of defendant for the commission of the crime charged.

The mere fact that a fire has occurred affords no proper basis for an inference that it was wrongfully set. Under such circumstances it may be assumed that it was the result of accident or some natural cause. *People* v. *Lee*, 231 Mich 607, 612. In the case at bar, however, proofs were offered from which the jury might properly have concluded that the fire in defendant's restaurant did not result from any

natural or providential cause. The testimony of the officers tended to eliminate the possibility of defective wiring and, also, spontaneous combustion. The presence of the excelsior and charred paper in the fold of the mattress suggests that such combustible materials were placed there by human agency. That defendant might have gone to the basement prior to his leaving the restaurant at approximately 7 o'clock in the evening is not open to question. Materials used in connection with the operation of the business were stored in the basement, as appeared from the testimony of defendant's employee who was working there on May 10, 1953. As proprietor of the restaurant business defendant had right of access to the premises at all times.

The testimony with reference to the decline in earnings of the restaurant and the taking out of the insurance policies, above mentioned, clearly suggest a motive on defendant's part. Without discussing the evidence in further detail, we conclude that the trial judge was not in error in denying the motion for a directed verdict, or in submitting the cause to the jury. No claim is made that there was any error in the charge as to the law governing the case. The verdict returned may not be said to have been unsupported by sufficient proofs.

On the trial counsel for defendant sought to introduce the testimony of a witness with reference to an offer claimed to have been made to rent the restaurant business and the equipment therein. The purpose of such testimony was, as stated by counsel, to establish the value of defendant's interest. There was no showing, however, that the party making the offer was familiar with the rental value of such businesses, that he was experienced in the operation of restaurants, or that he had knowledge as to the earnings of the restaurant in question. Objection was interposed on behalf of the people and sustained

by the trial judge on the ground that no proper foundation had been laid. The ruling was correct. No showing was made that the witness was qualified to testify as to the value of the business.

Defendant did not testify in his own behalf. His counsel called, among other witnesses, one who had known defendant for 11 years and testified to satisfactory business relations with him. In answer to the question as to the reputation of defendant "for honesty and integrity" in the community in which he lived and carried on his business, he said that such reputation was good. On cross-examination the character witness was asked if he had ever heard of defendant having been involved in various offenses in Illinois, in Wisconsin, and in Indiana. No objection was made to any of such questions, 6 in number, the witness answering in the negative in each instance. At the conclusion of the cross-examination defendant rested. On behalf of appellant it is now claimed that the asking of the questions of the character witness constituted prejudicial and reversible error. On behalf of the people it is argued that the cross-examination was proper as bearing on the extent of the knowledge of the witness in testifying to good reputation, and also on his credibility.

Defendant was ably represented on the trial by competent and experienced counsel. If the questions were deemed objectionable no reason is advanced why an objection was not interposed. There was no motion to strike the testimony nor does it appear from the record that there was any specific request to the court to instruct the jury with reference to it. It is quite possible that had reports or rumors of the prior difficulties with the law, referred to in the questions to the character witness, been circulated in Ypsilanti to the knowledge of the witness, his opinion as to defendant's reputation might have been other than as expressed. Rumors and reports of

violations of the law committed by defendant elsewhere, if circulated in the city of Ypsilanti, might well have affected his reputation therein.

The general rule seems to be well established that a character witness who has testified to the good reputation of the defendant in a criminal case may be asked on cross-examination, for the purpose of testing his credibility and indicating the weight to be given to his testimony, whether he has heard reports of prior conduct on the part of defendant tending to affect his reputation for honesty and integrity. The general rule is summarized in 58 Am Jur, Witnesses, § 658, p 363, as follows:

"A witness as to character may, on cross-examination, be interrogated as to what he has heard in the community respecting the character of the party inquired about. While there is some authority to the contrary, it is generally held that a character witness may be cross-examined as to the existence of reports of particular acts and vices or associations of the person concerning whom he testified which are inconsistent with the reputation attributed to him by the witness—not to establish the truth of the facts, but to test the credibility of the witness, and to ascertain what weight or value is to be given his testimony. Such testimony tends to show either that the witness is unfamiliar with the reputation concerning which he has testified, or that his standards of what constitutes good repute are unsound."

..A comprehensive note on the general subject of the cross-examination of character witnesses is found in 71 ALR 1504. In the course of the discussion, it is there said (pp 1505, 1514):

"According to the overwhelming weight of authority, a witness testifying to the good reputation or character of a defendant in a criminal prosecution may be interrogated on cross-examination with respect to rumors or reports of particular acts im-

puted to the defendant, and as to what the witness has heard of specific charges of misconduct made against the defendant.   *   *   *

"The purpose of the cross-examination of the defendant's character witness with reference to particular acts of the defendant is not to establish such acts as facts, or to prove the truth of the rumors or charges inquired about, but merely to show the circulation of rumors of such acts, and to test the credibility of the character witness, by ascertaining his good faith, information, and accuracy."

The above statements are supported in the annotation by extensive citations.

In *Michelson* v. *United States,* 335 US 469 (69 S Ct 213, 93 L ed 168), in discussing at some length the basis of so-called character testimony and practical incidents pertaining thereto, it was said, in part (pp 479, 482, 483):

"The price a defendant must pay for attempting to prove his good name is to throw open the entire subject which the law has kept closed for his benefit and to make himself vulnerable where the law otherwise shields him.   The prosecution may pursue the inquiry with contradictory witnesses to show that damaging rumors, whether or not well-grounded, were afloat—for it is not the man that he is, but the name that he has which is put in issue.   Another hazard is that his own witness is subject to cross-examination as to the contents and extent of the hearsay on which he bases his conclusions, and he may be required to disclose rumors and reports that are current even if they do not affect his own conclusion. It may test the sufficiency of his knowledge by asking what stories were circulating concerning events, such as one's arrest, about which people normally comment and speculate.   Thus, while the law gives defendant the option to show as a fact that his reputation reflects a life and habit incompatible with commission of the offense charged, it subjects his proof to tests of credibility designed to prevent him from

profiting by a mere parade of partisans. ' * * *

. "Since the whole inquiry, as we have pointed out, is calculated to ascertain the general talk of people about defendant, rather than the witness' own knowledge of him, the form of inquiry, 'Have you heard?' has general approval, and 'Do you know?' is not allowed.

"A character witness may be cross-examined as to an arrest whether or not it culminated in a conviction, according to the overwhelming weight of authority. This rule is sometimes confused with that which prohibits cross-examination to credibility by asking a witness whether he himself has been arrested.

"Arrest without more does not, in law any more than in reason, impeach the integrity or impair the credibility of a witness. It happens to the innocent as well as the guilty. Only a conviction, therefore, may be inquired about to undermine the trustworthiness of a witness.

"Arrest without more may nevertheless impair or cloud one's reputation. False arrest may do that. Even to be acquitted may damage one's good name if the community receives the verdict with a wink and chooses to remember defendant as one who ought to have been convicted. A conviction, on the other hand, may be accepted as a misfortune or an injustice, and even enhance the standing of one who mends his ways and lives it down. Reputation is the net balance of so many debits and credits that the law does not attach the finality to a conviction, when the issue is reputation, that is given to it when the issue is the credibility of the convict.

"The inquiry as to an arrest is permissible also because the prosecution has a right to test the qualifications of the witness to bespeak the community opinion. If one never heard the speculations and rumors in which even one's friends indulge upon his arrest, the jury may doubt whether he is capable of giving any very reliable conclusions as to his reputation."

Prior decisions of this Court are in accord with the general rule as above indicated. Thus in *People* v. *Huff,* 173 Mich 620, 624, it was said:

"It is well settled that, when a witness is called to attack or defend character, he can only be asked, on his examination in chief, as to the general character of the person in question; and he will not be allowed to testify as to particular facts, either favorable or unfavorable to such person; but, upon cross-examination, he may then be asked, with a view to test the value of his testimony, as to particular facts. 1 Taylor on Evidence, § 352; 3 Rice on Criminal Evidence, § 375; *State* v. *Merriman,* 34 SC 16 (12 SE 619)."

Likewise, in *People* v. *Hill,* 258 Mich 79, the Court, in discussing the scope of cross-examination of a character witness in a criminal case, said (p 85):

"There is a difference in the rules governing the introduction of rebuttal testimony and governing cross-examination. A witness who testifies to another's good reputation may be cross-examined to test his knowledge and candor (22 CJ, p 483); for that purpose it has been held he may be asked if he has heard of specific cases of misconduct. He may be asked these questions only to test his credibility and ascertain the weight to be given to his testimony. *Rex* v. *Martin,* 6 Car & P 562 (172 Eng Rep 1364); *Leonard* v. *Allen,* 11 Cush (65 Mass) 241; *Commonwealth* v. *O'Brien,* 119 Mass 342 (20 Am Rep 325)."

Of like import is *People* v. *Rosa,* 268 Mich 462, 465.

We are not dealing in the instant case with the cross-examination of a defendant in which questions have been propounded for the purpose of establishing that the accused has committed crimes other than the one for which he is on trial, but of which he has not been convicted. A typical illustration of such a case is afforded by *People* v. *Kelsey,* 303 Mich 715, to which counsel for appellant have referred in

their brief. Said decision and others of like nature, including *People* v. *Wright,* 294 Mich 20, are not in point with reference to the scope of the cross-examination of character witnesses. Testimony as to a defendant's reputation for citizenship, or for "honesty and integrity," is based, as has been repeatedly pointed out in decisions dealing therewith, on hearsay. Such fact naturally has a bearing on the right of the cross-examiner to test the knowledge and credibility of the character witness by inquiries as to whether he *has heard* of prior acts of misconduct on the part of such defendant.

We find no error in the case, and the verdict and sentence should be affirmed.

DETHMERS, C. J., and KELLY, J., concurred with CARR, J.

KAVANAGH, J. The defendant in this case was convicted of the crime of arson by a jury in the Washtenaw county circuit court.

The facts with reference to the case have been presented in detail in the opinion of Mr. Justice CARR.

Appellant makes several claims of error, which he feels justify the granting of a new trial, all of which have been answered by Justice CARR in his opinion. I respectfully disagree with only one of his conclusions.

At the trial of the cause defendant did not take the stand on his own behalf. He did, however, in defense, present a character witness who was a professor of sociology and criminology at Michigan State Normal College (now Eastern Michigan College), who testified that he had been connected with the college for 27 years; that he had known the defendant, Mr. Dorrikas, for 11 years, and had business relations with him during that whole period.

He further testified that defendant's reputation for honesty and integrity in the area of the city of Ypsilanti in which defendant lived and carried on his business was good. The following cross-examination was carried on by the prosecuting attorney:

"*Q.* Dr. Thompson, you say you are a professor of sociology and criminology at the Michigan State Normal College?

"*A.* Yes, sir.

"*Q.* And for how long a period has that been?

"*A.* Twenty-seven years.

"*Q.* And you have testified, that Mr. Dorrikas' reputation for honesty and integrity is good? Is that right?

"*A.* Yes, sir.

"*Q.* Now, it has been good during the time that you have known him, is that correct?

"*A.* Yes.

"*Q.* Now, Dr. Thompson, have you ever heard that James Dorrikas was arrested and convicted in Peoria, Illinois, of the crime of disorderly conduct?

"*A.* No, sir.

"*Q.* Have you ever heard, sir, that in Peoria—or in, yes, in Peoria, Illinois, James Dorrikas was arrested for robbery?

"*A.* No, sir.

"*Q.* Have you ever heard that in Milwaukee, Wisconsin, James Dorrikas was arrested for vagrancy?

"*A.* No, sir.

"*Q.* Have you ever heard that he has been arrested for violation of the liquor laws?

"*A.* No, sir.

"*Q.* Have you ever heard that he was arrested in the State of Indiana, and convicted of the crime of bank robbery?

"*A.* No, sir.

"*Q.* Have you ever heard, sir, that in Peoria, Illinois, James Dorrikas was arrestd for contributing to the delinquency of a minor child—for rape?

"*A.* No, sir.

"*Mr. Calder:* That is all, sir.
"*Mr. De Otte:* That is all.
"*The Court:* The defense rests?
"*Mr. De Otte:* That is right."

No objection was made to the cross-examination by defendant's attorney, and no instruction was given the jury by the trial judge as to the purpose of such cross-examination and the limited consideration that they could give to it.

Defendant in his motion for new trial, and on appeal here, contends that this cross-examination and the failure of the trial court to properly instruct the jury were prejudicial to his rights.

Ordinarily where no timely objection was made to the introduction of such testimony and no request to charge was made, this Court would not examine the points relied upon for reversal, and except under unusual circumstances we have no disposition to relax this rule. Nevertheless, as in a number of previous cases, this Court, in the exercise of supervisory control over all litigation, has often asserted the right to consider manifest and serious errors although objection was not made by the party who appeals. The inherent power of this Court to prevent fundamental injustice is not limited by what appellant is entitled to as a matter of right. *People* v. *Steeneck,* 247 Mich 583; *People* v. *Holmes,* 292 Mich 212; *People* v. *Kelsey,* 303 Mich 715.

While it is admitted that the general rule seems to be well established that a character witness who has testified to the good reputation of the defendant in a criminal case may be asked on cross-examination, for the purpose of testing his credibility and indicating the weight to be given to his testimony, whether he has heard reports of prior conduct on the part of defendant tending to affect his reputation for honesty and integrity, it is equally well established

that such cross-examination shall be limited as to time and, in some instances, place. The admissibility of cross-examination of this type and its effect has been the subject of comment on the part of textbook writers and other students of the law for a number of years. The number of decisions of appellate courts, both in the State of Michigan and other States of the union as well as the United States supreme court, indicates to even the casual observer that this particular field of the law has been a very controversial one. This undoubtedly has resulted from trying to write fair and just rules for the conduct of criminal cases, which would preserve the presumption of innocence surrounding a defendant in a criminal case and preserve from prejudice the constitutional rights of a defendant who does not take the stand, while at the same time making it possible for the authorities whose duty and responsibility it is to prosecute those, thought to be guilty of crime, to have a fair opportunity to learn whether or not witnesses who testify as to the character and reputation of a defendant have adequate knowledge of this reputation, and to test their credibility as witnesses so that a jury may arrive at the proper weight to be given to their testimony.

It seems to us that appellate courts ordinarily have very wisely left this responsibility with the trial judge and have allowed him considerable discretion in determining whether or not particular questions may be asked of such a witness, and have wisely relied upon the trial judge to properly instruct the jury in this regard. Ordinarily we would not believe in an appellate court substituting its judgment on this question for that of the trial court. However, as in this case, where no instruction has been given the jury, and where there is nothing in the record to show whether the trial court was informed as to when, if at all, these alleged acts took

place, where so far as the record is concerned, it might well be only a figment of the imagination of the prosecuting attorney, used for the definite purpose of prejudicing the minds of the jurors, we cannot refuse to act.

It would seem that the trial judge failed to use proper care to protect the defendant's rights.

Justice Jackson, speaking for the United States supreme court in *Michelson* v. *United States,* 335 US 469 (69 S Ct 213, 93 L ed 168), with reference to limiting cross-examination of character witnesses in regard to hearsay testimony, said (p 480):

"Wide discretion is accompanied by heavy responsibility on trial courts to protect the practice from any misuse."

Justice CARR quotes at considerable length from the *Michelson Case* in support of his opinion. However, in order to properly understand the decision in that case, it seems to me that greater discussion is needed. In this case Justice Jackson delivered the opinion of the court. Mr. Justice Frankfurter wrote a concurring opinion, in which he said (p 487):

"Despite the fact that my feelings run in the general direction of the views expressed by Mr. Justice Rutledge in his dissent, I join the court's opinion."

Justice Frankfurter felt that great leeway should be given to the trial judge. Justice Rutledge was joined by Justice Murphy in the dissenting opinion in which he wrote to establish what he called the only fair rule to foreclose the entire line of inquiry concerning specific incidents in the defendant's past, both on cross-examination and on new evidence in rebuttal.

Justice Jackson, in the *Michelson Case,* said (pp 471, 472):

"Defendant called 5 witnesses to prove that he enjoyed a good reputation. Two of them testified that their acquaintance with him extended over a period of about 30 years and the others said they had known him at least half that long. A typical examination in chief was as follows:

" '*Q*. Do you know the defendant Michelson?

" '*A*. Yes.

" '*Q*. How long do you know Mr. Michelson?

" '*A*. About 30 years.

" '*Q*. Do you know other people who know him?

" '*A*. Yes.

" '*Q*. Have you had occasion to discuss his reputatation for honesty and truthfulness and for being a law-abiding citizen?

" '*A*. It is very good.

" '*Q*. You have talked to others?

" '*A*. Yes.

" '*Q*. And what is his reputation?

" '*A*. Very good.'

"These are representative of answers by 3 witnesses; 2 others replied, in substance, that they never had heard anything against Michelson.

"On cross-examination, 4 of the witnesses were asked, in substance, this question: 'Did you ever hear that Mr. Michelson on March 4, 1927, was convicted of a violation of the trade-mark law in New York City in regard to watches?' This referred to the 20-year-old conviction about which defendant himself had testified on direct examination. Two of them had heard of it and 2 had not.

"To 4 of these witnesses the prosecution also addressed the question the allowance of which, over defendant's objection, is claimed to be reversible error:

" 'Did you ever hear that on October 11, 1920, the defendant, Solomon Michelson, was arrested for receiving stolen goods?'

"None of the witnesses appears to have heard of this.

"The trial court asked counsel for the prosecution, *out of presence of the jury,* 'Is it a fact according to the best information in your possession, that Michelson was arrested for receiving stolen goods?' Counsel replied that it was, and to support his good faith exhibited a paper record which defendant's counsel did not challenge.

"The judge also on 3 occasions warned the jury, in terms that are not criticized, of the limited purpose for which this evidence was received.[3]" (Emphasis supplied.)

In footnote 3, Justice Jackson said (pp 472, 473);

"In ruling on the objection when the question was first asked, the court said:

" 'I instruct the jury that what is happening now is this: the defendant has called character witnesses, and the basis for the evidence given by those character witnesses is the reputation of the defendant in the community, and since the defendant tenders the issue of his reputation the prosecution may ask the witness if she has heard of various incidents in his career. I say to you that regardless of her answer you are not to assume that the incidents asked about actually took place. All that is happening is that this witness' standard of opinion of the reputation of the defendant is being tested. Is that clear?'

"In overruling the second objection to the question the court said:

" 'Again I say to the jury there is no proof that Mr. Michelson was arrested for receiving stolen goods in 1920, there isn't any such proof. All this witness has been asked is whether he had heard of that. There is nothing before you on that issue. Now would you base your decision on the case fairly in spite of the fact that that question has been asked? You would? All right.'

"The charge included the following:

" 'In connection with the character evidence in the case I permitted a question whether or not the witness knew that in 1920 this defendant had been

arrested for receiving stolen goods. I tried to give you the instruction then that that question was permitted only to test the standards of character evidence that these character witnesses seemed to have. There isn't any proof in the case that could be produced before you legally within the rules of evidence that this defendant was arrested in 1920 for receiving stolen goods, and that fact you are not to hold against him; nor are you to assume what the consequences of that arrest were. You just drive it from your mind so far as he is concerned, and take it into consideration only in weighing the evidence of the character witnesses.' "

Justice Jackson further said (p 481):

"The trial judge was scrupulous to so guard it in the case before us. He took pains to ascertain, out of presence of the jury, that the target of the question was an actual event, which would probably result in some comment among acquaintances if not injury to defendant's reputation. He satisfied himself that counsel was not merely taking a random shot at a reputation imprudently exposed or asking a groundless question to waft an unwarranted innuendo into the jury box."

Subsequently, in the opinion dealing with the amount of time that had elapsed since the commission of the previous acts witness was asked about, the Court indicated that the trial judge was allowed a good deal of discretion and indicated that a trial judge, in his discretion, may well exclude inquiry about rumors of an event so remote, unless recent misconduct revived them. Justice Jackson said (p 484) that events a generation old are likely to be lived down and dropped from the present thought and talk of the community and to be absent from the knowledge of younger or more recent acquaintances.

It might also be said our system proposes to give a criminal an opportunity to reform, and if he does reform, in all fairness he should not be subjected to embarrassment for previous mistakes.

In the instant case, if these acts happened at all, they must have happened more than 11 years prior to the trial when defendant was living away from his present community.

The majority opinion in the *Michelson Case* pointed out that 2 of the witnesses dated their acquaintance with the defendant as commencing 30 years before the trial. Defendant, on direct examination voluntarily called attention to his conviction 20 years before. The court under these circumstances could not say that the admission into evidence of this past conviction was an abuse of discretion. Under these safeguards, above set forth, Justice Jackson affirmed the judgment of the lower court.

It is to be noted that the *Michelson Case* was decided December 20, 1948. Since that time 2 cases have been decided by courts of appeal, one in October, 1956, the case of *Roberson* v. *United States* (CCA), 237 F2d 536. Judge Rives there said (p 540):

"The district court and this court are, of course, bound by the majority opinion of the supreme court, but a careful reading of that opinion persuades us to the view that it marks out the extreme limits of permissible cross-examination. Further, the supreme court itself implied essential safeguards which have not been observed in the present case. For example, the court made repeated note of the fact that the trial court had ascertained *out of the presence of the jury* that the arrest or conviction had actually occurred. 335 US 472, 481 (69 S Ct 216, 221, 93 L ed 171, 172, 176), and footnote 18 on the latter page."

Further on in the opinion Judge Rives quotes the words of Judge Harlan, now Mr. Justice Harlan, in regard to government counsel conducting the prosecution (p 541):

" 'We may also add that it is incumbent on prosecuting attorneys to be scrupulous in not stepping out of bounds on this sort of cross-examination.' *United States* v. *H. Wool & Sons* (CCA), 215 F2d 95, 99."

Concluding his opinion, Judge Rives said (pp 541, 542):

"In his final charge to the jury, the learned district judge ably and correctly instructed them. We apprehend, however, that it was then too late to cure the repeated errors. Before we can accord entire verity to a verdict of guilty, that verdict must result from a trial fairly conducted in every material respect in accordance with the rules of law, and, inadvertently this trial was not so conducted."

The court reversed the conviction and remanded the case for a new trial.

Also, in the case of *United States* v. *Phillips* (CCA), 217 F2d 435, decided December 2, 1954, in which the court reversed a conviction and remanded for new trial on other grounds, the court had this to say in the opinion of Judge Major (pp 443, 444):

"We perhaps should not conclude without mention of another matter which under the circumstances would be difficult to excuse as nonprejudicial error. The defendant called 8 character witnesses who testified as to his good reputation among his friends and associates for honesty, integrity and fair dealing. On cross-examination of 1 of such witnesses, a Mr. Gallagher, the following questions were asked by the government:

" 'Did you hear that in the year 1934, well, specifically, that in January of 1934, in September of 1934, and in October of 1934, Mr. Phillips was arrested

for issuing checks to defraud. Did you ever hear of that? * * *

" 'Did you hear that in July of 1934 and in September of 1934, Mr. Phillips had been arrested for obtaining money under false pretenses? * * * These are 2 additional. Did you ever hear of that?'

"Defendant objected to these questions on the basis that they were highly prejudicial, which objection was overruled by the court. To each question the witness answered, 'No,' that is, that he had never heard of the charges implied by the questions. At the time these questions were thus propounded and answered, no instruction was given to the jury as to their relevancy or as to the purpose for which they could be considered. The record is entirely devoid of any showing as to whether the defendant had in fact been arrested, as implied by the questions. Neither does the record disclose except by vague inference that the court was at any time advised that the government was prepared to prove such arrests. The most that is shown is that after the conclusion of the trial, in a colloquy between the court and counsel on defendant's motion for a new trial, the court in response to an inquiry by government's counsel stated that he recalled that there was submitted to him during the trial the *Michelson Case, Michelson v. United States,* 335 US 469 (69 S Ct 213, 93 L ed 168).

"More than that, the final charge to the jury made no reference to the cross-examination of this character witness or the purpose for which it was permitted. It is true that the government tendered an instruction (No. 11-A) purporting to state the reason for and purpose of the cross-examination. The instruction as proposed was objected to by the defendant on the basis that it assumed a number of matters which were not in proof, including the assumption that the defendant had actually been arrested, as implied by the questions. The court refused to give the instruction and in doing so stated, 'There is not any proof in the case that could be pro-

duced that defendant was arrested.' It is now argued by the government that the court's refusal to give the instruction under the circumstances forecloses the defendant from claim of error on appeal. With this we do not agree. In the first place, it is doubtful if any instruction could have been given at that late time which would have dissipated the harmful effect of the cross-examination. In the second place, when the instruction was refused by the court because of its form, the duty devolved upon the government to tender a proper instruction. Upon its failure to do so, we think it was the duty of the court of its own volition to instruct the jury as to the purpose for which the cross-examination was permitted, as well as the extent to which it could be considered by the jury.

"Both sides rely upon the *Michelson Case* in support of their positions on the cross-examination under discussion. It is true the court in that case approved a similar cross-examination under the facts and circumstances before it. There, however, the trial court at the time of the occurrence twice instructed the jury as to the limited purpose for which the examination could be utilized and again so instructed the jury in its final charge, see footnote to *Michelson, supra,* 335 US at pages 472, 473 (69 S Ct at pages 216, 217, 93 L ed at page 172). The supreme court, referring to the precautionary means employed by the trial court, stated 335 US at pages 480, 481 (69 S Ct at page 221, 93 L ed at page 176).

" 'Wide discretion is accompanied by heavy responsibility on trial courts to protect the practice from any misuse. The trial judge was scrupulous to so guard it in the case before us. He took pains to ascertain, out of presence of the jury, that the target of the question was an actual event, which would probably result in some comment among acquaintances if not injury to defendant's reputation. He satisfied himself that counsel was not merely taking a random shot at a reputation imprudently exposed

or asking a groundless question to waft an unwarranted innuendo into the jury box.'

"In the instant case no such precautionary measures were taken. In fact, there were no precautionary measures of any kind. For aught that is disclosed by the record, the jury was at liberty to consider the damaging implication inherent in the government's cross-examination for any and all purposes."

It is apparent from a reading of these cases that the appellate courts mentioned believe the United States supreme court would not permit the type of cross-examination carried on in the instant case without (1) the trial judge determining, in the absence of the jury, whether or not the criminal acts actually took place, the time of their commission, and a determination as to whether they were relevant to the issue being tried, and (2) the trial judge making a careful instruction to the jury as to the reasons testimony as to the criminal acts is being admitted.

We need not extend this opinion for further discussion of the questions and facts involved. With due respect to the learned circuit judge who presided at this trial, it is to be pointed out that he was somewhat handicapped by failure of counsel to make objections to the questions. Regardless of all other questions and considerations, however, it is the heavy responsibility of a reviewing court to ascertain if a defendant has had a fair and impartial trial, a trial free from prejudicial errors. In the instant case, it is our considered judgment that the defendant did not have such a trial. Since the record discloses the trial judge's failure to make inquiry out of the presence of the jury as to whether such acts were actually committed and as to the time and place of the acts, and the trial judge's failure to properly instruct the jury as to the purpose of such testimony and the limitations upon the use they might make of

it, defendant was deprived of a fair trial.

The conviction appealed from is reversed and the cause is remanded for new trial.

SMITH, BLACK, EDWARDS, and VOELKER, JJ., concurred with KAVANAGH, J.