770 F.2d 166
 Unpublished Disposition
NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
ARTHUR LANKFORD, PETITIONER-APPELLANT,
v.
DALE FOLTZ, RESPONDENT-APPELLEE.
 NO. 84-1814
 United States Court of Appeals, Sixth Circuit.
 7/30/85
 
 E.D.Mich.
 AFFIRMED
 ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF MICHIGAN
 Before: MERRITT and WELLFORD, Circuit Judges; and SPIEGEL, District Judge.*
 MERRITT, Circuit Judge.
 
 
 1
 In this appeal from District Judge Cohn's denial of his habeas corpus petition, Arthur Lankford, convicted in March, 1978, by a Wayne County, Michigan, Circuit Court jury of first degree murder, argues that he was denied his Fourtheenth Amendment right to notice of the charges against him because the prosecution added and the trial court instructed the jury on a charge of first degree premeditated murder when the information charged only first degree felony murder. He also contends that his trial was rendered fundamentally unfair, in violation of the Sixth Amendment, by various acts of prosecutorial misconduct, and that his jury conviction was not supported by sufficient evidence. While our reasoning regarding emendation of the information differs from that of Judge Cohn, we affirm the District Court's decision and deny Lankford's petition.
 
 I.
 
 2
 Lankford was convicted of first degree murder in connection with the killing of Ben Davis during the robbery of a card game in Ecorse, Michigan, on May 3, 1977. The evidence presented by the prosecution showed that Lankford met with four other men at the home of his girlfriend on the evening of May 2, 1977, planned the robbery, and waited outside in an automobile while the robbery and murder occurred. Dan Allen testified (see A. 131-45) that Lankford picked him up in his car on that evening and asked him if he wanted to make some money by robbing a card game at The Hole, a backroom card parlor in a bar in Ecorse. Allen acted as the door man for card games at The Hole, where his father and uncle often played, and Lankford told Allen that Allen's role in the robbery would be to leave the back door to The Hole open for the others to enter.
 
 
 3
 Allen testified further that after he accepted Lankford's offer, they drove to the home of Eleanor Coleman, Lankford's girlfriend, where he met Marion Robinson, Richard MacDonald and Richard, an as yet unapprehended member of the group. Allen testified that Lankford called each member of the group into the kitchen, and talked to them separately. MacDonald testified (see A. 161-188) that Lankford told him they were going to do a 'ripoff,' and Allen said Lankford asked him if he was all set to go. Both Allen and MacDonald testified that Lankford's girlfriend made several phone calls to The Hole during the course of the evening, each time asking if Ben Davis was there.
 
 
 4
 At approximately 1:30 in the morning on May 3, Lankford, MacDonald, Allen, Robinson and Richard left Lankford's girlfriend's house in Lankford's car. Lankford stopped at two houses where he went inside and returned with a sawed off shotgun and rifle, and then drove to his own home where he obtained a pistol. As they drove to The Hole, MacDonald asked about the type of the pistol, and, apparently impressed that it was a nine millimeter blue steel revolver, asked if he could use it in the robbery. Lankford told him that Richard was going to use the pistol.
 
 
 5
 When they arrived at The Hole, Lankford and Allen went in briefly and then Lankford returned to await Allen's phone call at a nearby pay phone booth. Lankford took the call, and returned to his car while MacDonald, carrying the shotgun, Robinson, carrying the rifle, and Richard, revolver in hand, went into The Hole through the back door which Allen had opened. MacDonald and Robinson wore stocking masks but Richard did not wear a mask.
 
 
 6
 MacDonald stated that upon entering The Hole, Robinson shouted that it was a stickup and ordered everyone to get up against the wall. MacDonald went into the bathroom to retrieve some of the card players who had attempted to hide there. When he returned, he saw Richard standing over Ben Davis with his pistol at Davis' head, and heard Davis mumbling something before immediately seeing Richard's gun fire and Davis slump to the floor. MacDonald said he was shocked and argued with Richard over why he had shot Davis. The group fled, without apparently finding any money, and returned to Lankford's car, where MacDonald told Lankford that a man had been shot. When Richard got into the car, Lankford turned to him and asked, 'Was it Ben?' who had been shot. Allen stated that later, after they had returned to Lankford's girlfriend's home, Robinson and MacDonald told him they had no idea why Richard had shot Davis.
 
 
 7
 In an attempt to establish that the robbery was set up by Lankford as a cover for Davis' murder, the prosecution introduced testimony by Bessie Moore, one of the card players who frequented The Hole. She said the same card game had been robbed several weeks before, and that Ben Davis had stated on several occasions that he knew two of the men who had robbed the game and was going to kill them. A. 90-100, 107-09. Allen testified that in his initial conversation on May 2 with Lankford, Lankford told him that the robbery would be safe and nobody would be hurt, just like the earlier robbery. A. 159. The prosecution thus attempted to show that Lankford arranged Davis' murder because Davis knew that Lankford had participated in the previous robbery and was going to kill him.
 
 
 8
 Lankford relied on an alibi defense. He and his father testified that he had driven to Atlanta, Georgia, on April 23, 1977, and was in Atlanta on the date of the crime.
 
 
 9
 Lankford was charged by information, as is the normal method of bringing criminal charges in Michigan. The first count charged that 'while in the perpetration or attempted perpetration of ROBBERY (Lankford) did kill and murder one BEN DAVIS, JR., Contrary to Sec. 750.316, M.C.L.A.' A. 14. He was thus charged generally with first degree murder, since M.C.L.A. Sec. 750.316 provides that both 'wilful, deliberate and premeditated killing' and killing 'committed in the perpetration, or attempt to perpetrate any . . . robbery' shall constitute first degree murder. Lankford was also charged with possession of a firearm while in commission of a felony(felony-firearm) under M.C.L.A. 750.227(b).[1]
 
 
 10
 Lankford's trial was severed from that of his codefendants. At an earlier trial, MacDonald was convicted of armed robbery and possession of a firearm while in commission of a felony, and Robinson was acquitted of all charges. Allen had not been tried when Lankford's trial was held. In exchange for Allen's testimony, the prosecutor agreed to charge Allen with armed robbery, to dismiss the first degree murder charge against him, and to recommend leniency at sentencing. According to the prosecution's opening statement, Richard, the unapprehended killer, was Lankford's cousin.
 
 
 11
 In his opening statement to the jury, the prosecutor said the charge against Lankford was murder in the first degree, either through a premeditated plan to kill Davis or under the felony-murder statute. A. 55-59. The defendant raised no objection during this portion of the opening statement.
 
 
 12
 The prosecution's theory of the case given by the court in its jury charge was that 'Ben Davis was shot and killed during the perpetration of the robbery and further that the murder of Ben Davis was planned' and that 'defendant planned the death of Ben Davis' and also planned the felony underlying the felony-murder charge. A. 367. Lankford's counsel objected to instructing the jury on the prosecution's planned murder theory on the ground that no evidence had been supported to substantiate the theory, but the trial court overruled that objection, finding there was circumstantial evidence supporting the theory. A. 266-67.
 
 
 13
 The trial court instructed the jury on the elements of felony murder but not on the elements of first-degree premeditated murder. A. 359-361. However, the court also instructed the jury that they could convict Lankford of first degree premeditated murder:
 
 
 14
 You have been instructed there are two kinds of first degree murder. Those two kinds are: One, willful, deliberate and premeditated murder and two, felony murder. Both are kinds of first degree murder.
 
 
 15
 A verdict in a criminal case must be unanimous. To be unanimous, each of you must agree upon which kind of first degree murder has been proven or that both kinds of first degree murder have been proven.
 
 
 16
 In otherwords, before you may return a verdict of guilty of first degree murder, each of you must agree that the verdict is willful, deliberate and premeditated murder or each of you must agree that the verdict is felony murder.
 
 
 17
 A. 363.
 
 
 18
 During its deliberations, the jury twice asked for definitions of the possible verdicts and the elements of the crimes for which Lankford could be convicted, but while the court reinstructed the jury on first degree felony-murder, second degree murder, and felony-firearm, on neither occasion did it repeat its original instruction that Lankford could be found guilty of first degree premeditated murder. A. 378-85, 390-95.
 
 
 19
 The jury found Lankford guilty of murder in the first degree and felony-firearm. A. 398. On May 12, 1980, the Michigan Court of Appeals affirmed Lankford's convictions in an unpublished memorandum opinion. People v. Lankford, No. 78-2783. On May 27, 1981, the Michigan Supreme Court reversed Lankford's felony-firearm conviction due to erroneous jury instructions and remanded the case for a new trial on the felony-firearm charge. People v. Lankford, 411 Mich. 939 (1981). Lankford has apparently never been retried on the felony-firearm charge.
 
 
 20
 In February, 1982, Lankford filed in the trial court an application for leave to file a delayed motion for new trial. On May 7, 1982, Wayne County Circuit Court in an oral opinion denied the application. Lankford then filed in the Michigan Court of Appeals an application for delayed appeal which that court denied on August 12, 1982. People v. Lankford, No. 64876. The Michigan Supreme Court on May 19, 1983 denied leave to appeal. People v. Lankford, 417 Mich. 997 (1983).
 
 
 21
 Lankford filed this habeas petition in District Court in Detroit on August 12, 1983. He raised the same three arguments for habeas relief as he raises here. District Judge Cohn rejected these contentions and denied Lankford's petition in an unpublished memorandum opinion dated October 29, 1984.
 
 III.
 A.
 
 22
 Lankford first argues that he was denied his Fourteenth Amendment due process right to notice of the charges against him because the trial court instructed the jury on premeditated first degree murder, a charge added by the prosecution during trial, when the information had only charged first degree felony murder. The District Court found that the prosecutor effectively amended the information to include a crime for which Lankford had not been formally charged, thus violating Lankford's right to notice of the charges against him. Relying on Gray v. Raines, 662 F.2d 569 (9th Cir. 1981), however, Judge Cohn refused to reverse Lankford's conviction on this ground because he found that 'the violation of Lankford's right to notice was harmless beyond a reasonable doubt because the presentation of his alibi defense was in no respect impaired by the prosecution's injection of a planned murder theory,' and 'the evidence was sufficient to support a conviction of either felony murder or premeditated murder.' A. 37.
 
 
 23
 We agree with Judge Cohn that Lankford's conviction need not be reversed on the ground of emendation of the indictment, because we find that the information fairly informed Lankford that he was charged with both first degree felony murder and premeditated murder. Count one of the information alleges that Lankford 'while in the perpetration or attempted perpetration of robbery, did kill and murder one Ben Davis' and charges him under M.C.L.A. 750.316, a statute including both felony murder and premeditated murder. In ruling that Lankford had not been formally charged with premeditated murder, the District Court erred by emphasizing the lack of a specific, formal premeditated murder charge, and ignoring the plain meaning of the language of the information read in light of the underlying criminal statute.
 
 
 24
 Indictments are not required in state court criminal proceedings, since this particular requirement of the Fifth Amendment has never been held to apply to states. Watson v. Jago, 558 F.2d 330, 337 (6th Cir. 1977). Rather, where the charge is by the prosecutor after a preliminary hearing before a magistrate, the fundamental principle of due process and the Sixth Amendment right to a fair trial require 'notice of the specific charge, and a chance to be heard in a trial on issues raised by that charge, if desired.' Cole v. Arkansas, 333 U.S. 196, 201 (1948). A defendant's due process rights are violated when the information fails to 'fairly inform' him of the charges against him. Id.
 
 
 25
 The indictment here, which charged Lankford with murder under a statute encompassing both premeditated and felony murder, 'fairly informed' Lankford of the charges against him. This conclusion is bolstered by Lankford's counsel's failure to object to the prosecution's opening and closing statements, which clearly put forth both the premeditated planned murder and the felony murder theories, and by counsel's failure to object to the trial court instruction on both theories.
 
 
 26
 Lankford argues that under Michigan law, an information such as this charges only felony murder. However, none of the cases he cites even approach establishing such a rule. In People v. Buresh, 63 Mich. App. 629, 234 N.W.2d 736 (1975), where the defendant was convicted of manslaughter after claiming self-defense to a charge of first degree murder, the court reversed the defendant's conviction because the information did not charge felony murder and the jury could have found felony murder under the general first degree murder statute, but the prosecution conceded that felony murder could not have been charged and there was no preliminary examination on felony murder. 63 Mich. App. at 630-32, 234 N.W.2d at 737-38. Far from ruling that an open charge of murder does not include both felony and premeditated murder, People v. Gilbert, 55 Mich. App. 168, 222 N.W.2d 305 (1974), reversed the defendant's first degree murder conviction by general jury verdict because the jury could have found felony murder but the only evidence bearing on felony murder was an inadmissible confession. 55 Mich. App. at 173-74, 222 N.W.2d at 308. Finally, People v. Springs, 101 Mich. App. 118, 300 N.W.2d 315 (1980), involving the Michigan pandering statute, and the court specifically stated that the information could have been amended, even during the trial, so long as the defendant 'had sufficient notice and an opportunity to defend against the new charge.' 101 Mich. App. at 127-28, 300 N.W.2d at 319.
 
 
 27
 Lankford would have this court reverse his conviction because the information did not separately state, with technical specificity, the two forms of murder which were included under the relevant criminal statute. We refuse to adopt such a formalistic approach to the constitutional requirement of notice, and find that the information fairly informed Lankford that he was charged with both felony murder and premeditated murder.
 
 B.
 
 28
 Lankford next contends that he was denied his Sixth Amendment right to a fair trial when the prosecutor (a) attempted through innuendo to connect him with two uncharged robberies, (b) injected the collateral issue of his financial status, (c) introduced extraneous matters relating to his use of drugs, and (d) improperly argued that no alibi witnesses had gone to the police with their stories.
 
 
 29
 In considering this issue, it is important to note at the outset that in the habeas corpus context, 'only issues of constitutional magnitude are cognizable,' and 'the claim must allege a 'fundamental defect which inherently results in a complete miscarriage of justice or an omission inconsistent with the rudimentary demands of fair procedure." Koontz v. Glossa, 731 F.2d 365, 368 (6th Cir. 1984) (citing Hill v. United States, 368 U.S. 424, 428 (1962)). The scope of review over allegedly prejudicial arguments by state prosecuting attorneys is narrow, Cook v. Bordenkircher, 602 F.2d 117, 119 (6th Cir.), cert. denied, 444 U.S. 936 (1979), and in order to rise to the level of a constitutional violation warranting habeas relief, the prosecutor's statements must be 'so egregious as to render the trial fundamentally unfair.' Angel v. Overberg, 682 F.2d 605, 608 (6th Cir. 1982) (en banc).
 
 
 30
 The determination of fundamental unfairness is to be made by evaluating the totality of the circumstances in each case, with special weight given to 'the degree to which the remarks complained of have a tendency to mislead the jury and to prejudice the accused; whether they are isolated or extensive; whether they were deliberately or accidentally placed before the jury, and the strength of the competent proof of establish the guilt of the accused.' Id. (citing United States v. Leon, 534 F.2d 667, 679 (6th Cir. 1976)).
 
 
 31
 Applying this framework to the instances of alleged misconduct cited by the plaintiff, the District Court first found that the prosecutor's questions regarding the earlier, uncharged robberies were designed to show that Lankford's motive in killing Davis was his fear that Davis knew his identity as one of the robbers, and that although Richard MacDonald's girlfriend testified she saw Lankford in mid-May at his girlfriend's house, before a barber shop was robbed, the reference to a robbery did not implicate Lankford and was accidentally elicited. A. 40. Similarly, the prosecutor's questions regarding Lankford's receipt of welfare checks were part of a series of questions such as whether he had filled out an accident report, written a check, applied for any kind of license, or had his picture taken, which were designed to pin down his whereabouts during the time he said he was in Atlanta, and were thus relevant and did not prejudice the defendant.
 
 
 32
 As to witness comments about the use of drugs, almost all of these were accidentally elicited, objected to and stricken, and followed by the trial judge's admonition that the jury disregard the reference. Florine Mitchell testified that she had met Lankford in January, 1977 when she was going with Dan Allen. When the prosecutor asked Mitchell under what circumstances she had met Lankford, she replied that Allen 'was dealing some drugs' for him (Tr., Vol. 7, p. 114). Defense counsel objected and asked that the answer be stricken. The prosecutor then told the trial judge that he had not meant to get that answer. The trial judge ordered the jury to disregard the answer (Vol. 7, p. 115).
 
 
 33
 J.D. Landrum, the uncle of Dan Allen, testified that he saw Lankford three or four days before the robbery in Ecorse. Landrum testified that he was sure he had seen Lankford at that time because Landrum was looking for his nephew, Dan Allen, who 'was strung out on dope . . .' (Vol. 7, p. 130). Defense counsel objected to this answer as improper rebuttal and the trial judge and counsel held a brief off-the-record conference in chambers. When the prosecutor resumed questioning Landrum, the prosecutor asked Landrum to keep his answers short and precise (Vol. 7, p. 130). The District Court correctly found that these unsolicited references to drugs did not deprive Lankford of a fair trial.
 
 
 34
 Finally, with respect to the prosecutor's statement to the jury that Lankford's alibi witnesses had failed to report their stories to the police, A. 337, the District Court found that this statement was made only to counter defense counsel's argument that the police had done a poor job investigating Lankford's whereabouts, A. 315-16, and although arguably improper as suggesting that the witnesses failed to comply with a legal duty to report their stories to the police, was not so egregious as to deprive Lankford of a fair trial. A. 42.
 
 
 35
 The District Court correctly applied the test set forth by this court for constitutionally infirm prosecutorial misconduct, and we reject this ground for reversal.
 
 C.
 
 36
 Lankford's final argument is that the evidence is insufficient to support a conviction for either felony-murder or premeditated first degree murder. In Jackson v. Virginia, 443 U.S. 307, 318-19 (1979), the Court held that the appropriate standard for a habeas corpus court to apply in assessing a state prisoner's challenge to his conviction as founded upon insufficient evidence is 'whether the record evidence could reasonably support a finding of guilt beyond a reasonable doubt,' or 'whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt' (emphasis in original).
 
 
 37
 Given Lankford's role in the killing of Davis, he could only be guilty of first degree murder as an aider and abettor. Under Michigan law, to be convicted as an aider and abettor, the defendant must either possess the required intent or participate while knowing that the principal possessed the required intent. People v. Turner, 125 Mich. App. 8, 11, 336 N.W.2d 217, 219 (1983). Under Michigan law, first degree murder other than felony-murder is a specific intent crime requiring a premeditated intention to take human life, People v. Garcia, 398 Mich. 250, 259, 247 N.W.2d 547, 550 (1976), and this specific intent is required for aider and abettor liability where the crime charged is first degree murder.
 
 
 38
 The other elements of first degree premeditated murder are that a h micide occur and that the killing be committed with malice aforethought. People v. Morrin, 31 Mich. App. 301, 310-11, 324, 187 N.W.2d 434, 438 (1971). Although the Michigan Supreme Court's decision in People v. Aaron, 409 Mich. 672, 728, 299 N.W.2d 304, 326 (1980), requiring more than a mere intent to commit the underlying felony in order to convict for first degree felony murder did not apply to Lankford's trial, the jury was instructed that it had to find malice to convict him of murder. T9:95-97.
 
 
 39
 The District Court found the evidence showed Lankford brought the robbery participants together, instructed each as to his role in the robbery, procured the guns and specifically gave the murder weapon to Richard, who killed Davis without any apparent connection to the robbery, and then asked Richard afterward if Davis had indeed been shot. A. 44. Although evidence of Lankford's intent or knowledge of Richard's intent is largely circumstantial, the District Court was correct in ruling that some rational trier of fact could have found Lankford guilty beyond a reasonable doubt, primarily because the evidence clearly established that Lankford knew that the robbery would be committed and that Richard would be carrying a pistol, and there was sufficient circumstantial evidence that Lankford knew of Richard's intent or himself intended to kill Davis.
 
 
 40
 Accordingly, the judgment of the District Court is affirmed.
 
 
 
 *
 The Honorable S. Arthur Spiegel, Judge of the United States District Court for the Southern District of Ohio, sitting by designation
 
 
 [1]
 In pertinent part, these statutes read as follows:
 
 
 [750]
 316 First degree murder
 Sec. 316. FIRST DEGREE MURDER--All murder which shall be perpetrated by means of poison, or lying in wait, or any other kind of wilful, deliberate and premeditated killing, or which shall be committed in the perpetration, or attempt to perpetrate any arson, rape, robbery or burglary, shall be murder of the first degree.
 
 
 [750]
 227b. Possession at time of commission or attempted commission of felony; additional sentence, punishment
 Sec. 227b. (1) A person who carries or has in his possession a firearm at the time he commits or attempts to commit a felony, except the violation of section 227 or section 227a, is guilty of a felony, and shall be imprisoned for 2 years.